Justin M. Brandt (SBN: 031573)
Allan Bach (SBN: 036526)
**BIANCHI & BRANDT**
6730 N. Scottsdale Rd, Suite 100
Scottsdale, Arizona 85253
T: 480.531.1800
justin@bianchibrandt.com
allan@bianchibrandt.com
docket@bianchibrandt.com
*Attorneys For Plaintiff Arvin Saloum*

**UNITED STATES DISTRICT COURT**

**DISTRICT OF ARIZONA**

| | |
|---|---|
| Arvin Saloum, an individual,<br><br>Plaintiff,<br><br>vs.<br><br>Elizabeth Stavola, an individual.<br><br>Defendant. | Case No. 2:23-CV-02048-ESW<br><br>**SALOUM'S FIRST AMENDED COMPLAINT**<br><br>(Jury Trial Requested)<br><br>(The Hon. Eileen S. Willet) |

Plaintiff Arvin Saloum ("Saloum" or "Plaintiff") asserts the following claims against Elizabeth Stavola ("Stavola" or "Defendant") and alleges as follows:

**<u>Parties, Jurisdiction, and Venue</u>**

1. Saloum is an individual residing in Maricopa County, Arizona.

2. Upon information and belief, Defendant Elizabeth Stavola is an individual, residing in the state of New Jersey.

3. Defendant's misconduct took place in Maricopa County, Arizona.

4. This Court has jurisdiction over the parties and the subject matter hereof.

5. Venue is proper in this Court pursuant to Defendant's Notice of Removal (Doc. 1, Notice of Removal) and A.R.S. § 12-401 because the contracts, conduct, events, occurrences, acts, and omissions alleged in this Complaint all occurred within Maricopa County.

**<u>Factual Basis</u>**

6. Saloum re-alleges and incorporates by reference the preceding paragraph as though fully set forth herein.

**The Joint Venture Agreement**

7. In 2011, Saloum formed the Healing Center Wellness Center, Inc. ("HCWC"), an Arizona non-profit corporation, to seek and obtain a Dispensary Registration Certificate ("License") from the Arizona Department of Health Services ("AZDHS").

8. At all relevant times Saloum was a Principal Officer and Board Member of HCWC.

9. In 2012, HCWC was awarded a License issued by AZDHS allowing HCWC to operate the following marijuana facilities: (a) one retail medical marijuana dispensary ("Dispensary"); and (b) one separate "off-site" medical marijuana cultivation facility ("Cultivation Facility").

10. On January 14, 2013, Saloum, entered a Consulting and Joint Venture Agreement (the "JV Agreement") with HCWC and Stavola on behalf of Emerald City Organics, LLC ("ECO").

11. In consideration for the work Saloum performed to obtain the License, and in exchange for him turning over the management rights and beneficial control of HCWC to Stavola through ECO, Saloum agreed to receive future annual payments from HCWC calculated at 4% of HCWC's annual gross sales (JV Fees).

12. The JV Agreement provides the JV Fees for Saloum, stating:

> 6. <u>Continuing Consultant Fees</u>. Upon successfully opening the Dispensary as evidenced by obtaining DHS Approval to Operate, Client hereby agrees to continue retaining Consultant for ongoing consulting services and shall compensate Consultant for such services in an amount equal to 4% of the gross annual sales of the Dispensary calculated after all applicable taxes have been paid. Such payment shall be made on an annual basis and

> shall continue so long as the Dispensary is in operation. Client acknowledges that it has received adequate consideration for these fees, even if Consultant performs no further work on behalf of Client. Therefore, Client waives all claims and/or defenses relating to the adequacy of consideration for these fees.

13. The management rights and beneficial control of HCWC originates from the JV Agreement.

14. The JV Agreement also provides that [Management] must "diligently pursue and make all reasonable efforts to open and operate the Dispensary pursuant to State and local laws and regulations."

15. The JV Agreement granted Stavola through ECO "the exclusive control, and management" of the HCWC Dispensary. The JV Agreement requires Stavola through ECO to operate the Dispensary and to build out and operate the Cultivation Facility.

**The PerkAZ Transaction**

16. In 2014, Stavola as President of HCWC sold property containing the planned future site of HCWC's Dispensary in Chino Valley, Yavapai County, Arizona, to 5040 York, LLC (led by John Fritzel) for $2 million dollars. This sale implicitly included the management rights and beneficial control of HCWC, and thus implicitly included ECO, which held those exclusive HCWC rights. Fritzel transferred the Chino Valley property and implicitly ECO and its management and beneficial control rights in HCWC to PerkAZ Property, LLC ("PerkAZ") later that year.

17. Stavola was involved on both sides of the transaction. Stavola continued as a Principal Officer and Board Member ("PO/BM") of HCWC. Stavola also remained manager and leading principal of ECO.

**The 2015 Litigation**

18. By 2015, HCWC had yet to begin operations.

19. As such, Saloum filed suit against ECO, HCWC, and related principles to enforce his rights under the JV Agreement. *See* Maricopa County Superior Court Case No.

CV2015-055547 ("2015 Litigation").

20. By the end of 2016, the defendants in the 2015 Litigation (including Stavola) successfully moved to compel arbitration pursuant to the JV Agreement.

21. As a result, in early 2017, Stavola, on behalf of ECO, submitted the dispute to the American Arbitration Association with the assigning AAA Case No. 01-17-0001-8979. ("2018 Arbitration").

**The CBC/CGX Transaction**

22. During the early proceedings and discovery of the 2018 Arbitration, Stavola, while still a PO/BM of HCWC, set into motion another transfer of HCWC's management and beneficial control through her companies the Canadian Bioceutical Corp. and CGX Life Sciences Inc. ("CBC/CGX").

23. On January 5, 2017, CBC/CGX sent a letter of intent to HCWC. The letter of intent stated CBC/CGX's intent to purchase the management rights and beneficial control of HCWC including "any interest, agreement or affiliation it may have with Emerald City Organics, LLC."

24. In March 2017, Stavola, through her companies the Canadian Bioceutical Corp. and CGX Life Sciences Inc. (CBC/CGX) reacquired the JV Agreement's management rights and beneficial control of HCWC and the Chino Valley property from PerkAZ for $4 million. *See* CBC/CGX-PerkAZ Purchase Agreement, dated March 2017.

25. Once again, Stavola was involved on both sides of the transaction as she remained a PO/BM of HCWC throughout. Stavola further remained an executive of CBC/CGX.

26. As a precursor to the purported March 2017 acquisition, HCWC first transferred its management rights to PerkAZ. PerkAZ then transferred HCWC's management rights to CBC/CGX through its designee S8 Management.

27. Upon information and belief, the March 2017 Agreements were intended to

cover up the fact that ECO held the management rights and beneficial control to HCWC so that any future acquiror's of HCWC would be able to argue that HCWC was not subject to the JV Agreement and the JV Fees.

28. Upon information and belief, HCWC did not hold a board meeting about the purported transaction, nor did it pass any resolution approving its acquisition by CBC/CGX or to approve the March 2017 HCWC-PerkAZ Management Services Agreement. Stavola and Donald Friend who executed the March 2017 HCWC-PerkAZ Management Services Agreement acted without HCWC's board approval. Saloum had no notice or opportunity to object.

29. Upon information and belief, in connection with the March 2017 Agreements, Stavola misrepresented that: HCWC properly held and could transfer the management rights to its Dispensary; and there was no other party that had any claim to or interest in the management rights to HCWC.

30. Upon information and belief, through the March 2017 HCWC-PerkAZ Management, Stavola transferred to CGX the management and beneficial control rights to HCWC that HCWC did not lawfully possess, as it had previously transferred them to ECO under the JV Agreement.

31. Upon information and belief Stavola misappropriated ECO's management rights to HCWC through the March 2017 HCWC-PerkAZ Management Services Agreement.

32. Upon information and belief, the expungement of ECO's rights from the contractual structure of the March 2017 Agreements was intentionally led and/or implemented by Stavola as the lead for the acquiror CBC/CGX and as the lead for the acquiree HCWC.

33. Upon information and belief, Stavola also failed to object on behalf of ECO's rights to the transactions because Stavola's individual monetary interests were

ultimately furthered and maximized by doing so by virtue of her CBC/CGX companies' acquisition of a now less-encumbered HCWC.

34. Neither HCWC nor ECO has a unilateral right to terminate under the JV Agreement, which contains a notice requirement and an opportunity to cure any "Event of Default" of the JV Agreement. *See* JV Agreement, Sect. 8 (Event of Default).

35. Upon information and belief, there is no record, either documentary or testimonial, of any termination of the JV Agreement or of the management rights and beneficial control of HCWC that ECO acquired through the JV Agreement.

36. Upon information and belief, there is no record of any notice of termination and opportunity to cure provided by HCWC to ECO or any consent of all parties as would have been required to terminate ECO's management rights and the obligation to pay the JV Fees owed to Saloum under the JV Agreement.

37. The next month on April 28, 2017, an HCWC board of directors meeting was held and led by Stavola and attended by members Saloum, Sal Martelli, Linda Cherko, and John Fritzel, with member Donald Friend not in attendance. Saloum raised his ongoing concerns that his rights under the JV Agreement had not been met to date. Stavola reaffirmed that "we are 100% planning on paying [and] we have no intention of breaching the agreement in any fashion." *See* HCWC's Board Meeting Minutes dated April 28, 2017.

38. As of April 28, 2017, HCWC has yet to begin operations. Saloum's JV Fees were therefore not calculable yet. Saloum had no other option but to rely upon Stavola's representations that she would honor the obligations to pay the JV Fees in accordance with the JV Agreement.

**<u>The MPX Transaction</u>**

39. Upon information and belief, in 2018 either CBC/CGX rebranded into MPX Bioceutical Corp. (MPX) and/or Stavola transferred the management rights and

beneficial control of HCWC from CBC/CGX to MPX Bioceutical Corp. (MPX). Stavola also controlled MPX, remaining on both sides of the transaction.

**The 2018 Arbitration**

40. In Stavola's deposition leading up to the 2018 Arbitration proceedings, Stavola made another representation confirming the JV Fees owed to Saloum.

41. On March 30, 2018, Stavola affirmed a prior statement, reading her email to Saloum "I'm not going to guarantee anything other than you can be sure that I will pay you gentlemen your 4 percent and I will do it right."

42. The proceedings for the 2018 Arbitration were held in early June 2018.

43. During the arbitration proceedings, Stavola represented under oath that even after all the various transactions, Saloum's rights under the JV Agreement are intact and Saloum is still entitled to his JV Fees.

44. Stavola made these representations while also representing that MPX through one of its subsidiaries, S8 Management, held the management rights and beneficial control of HCWC, not ECO.

45. On June 6, 2018, Stavola stated under oath that "[t]he public company [MPX] bought ECO. So, from the way that I see it, is that the joint venture is still intact."

46. That same day and under oath, Stavola also affirmatively stated "yes" to the question: "So as you see it, Arvin's still entitled to his 4 percent?"

47. On August 9, 2018, an arbitration award was entered in the 2018 Arbitration ("2018 Arbitration Award"), finding that:

> 16. The [JV] Agreement is valid and enforceable and is and remains in full force and effect, including, without limitation…to pay Saloum continuing consulting fees equal to 4% of the gross annual sales of HCWC calculated after all applicable taxes (based on both the retail sales from the Dispensary and the wholesale sales from a grow facility when established), so long as HCWC was in operation.

48. The 2018 Arbitration Award also confirmed that the operation of the "Dispensary" (as defined in the JV Agreement) includes the development and operation of the Cultivation Facility.

49. The 2018 Arbitration Award concluded that as of August 9, 2018, "in the end ECO retained, or reacquired, its rights and is presently operating the Crismon Dispensary under the License."

**The iAnthus-MPX Transaction**

50. Upon information and belief, in the summer of 2018 while the 2018 Arbitration proceedings were ongoing, Stavola began negotiating another transaction involving the transfer of the management rights and beneficial control of HCWC to iAnthus.

51. Upon information and belief, those negotiations to transfer the management rights and beneficial control to iAnthus commenced prior to the 2018 Arbitration Award.

52. In October 2018, Stavola and iAnthus Capital Holdings Inc. ("iAnthus") entered into a transaction involving the acquisition of the management and beneficial control of HCWC ("iAnthus-MPX Transaction").

53. Upon information and belief, the due diligence period of the iAnthus-MPX Transaction commenced from the middle of 2018 until February 2019.

54. Upon information and belief, the iAnthus-MPX Transaction closed in February 2019. iAnthus acquired and or merged with MPX, which included the management rights and beneficial control to HCWC.

55. Saloum was kept in the dark about the iAnthus-MPX transaction and did not learn about the deal until after it closed.

56. The iAnthus-MPX Transaction documents did not specifically address the 2018 Arbitration Award or Saloum's ongoing interest in HCWC, including HCWC's obligation to pay Saloum the JV Fees.

57. Once again, Stavola was involved on both sides of the transaction as she transitioned into an executive role with iAnthus Capital Holdings or its affiliate, as Chief Strategy Officer and a member of the Board of Directors, while also remaining a PO/BM of HCWC.

58. In early 2019, Stavola made another representation to Saloum confirming his rights under the JV Agreement and specifically his JV Fees. On January 30, 2019, Stavola's counsel represented to Saloum's then counsel, stating:

> "Mark [McCain, Saloum's counsel], this is Mel McDonald. I represent Beth Stavola and her dispensary [HCWC]. A dispensary which Arvin's been on the board…We went through a lengthy arbitration last year. And it was resolved that he would get 4% after taxes."

59. At this time, HCWC was in its early stages of operations and the JV Fees owed to Saloum were not yet fully calculable, Saloum had no choice but to continue to take Stavola at her word that she would honor the JV Fees owed to him under the JV Agreement.

60. On March 28, 2019, a meeting was held by HCWC's members (including Stavola, the principal of ECO and Chief Strategy Officer and board member of iAnthus, and Donald Friend and John Fritzel) to elect a new board of directors for HCWC. Stavola proposed adding iAnthus principals and removing Saloum as PO/BMs.

61. Upon information and belief, Stavola actively refrained and prevented Saloum from acknowledging his interest in HCWC at the March 28th HCWC board meeting.

62. Upon information and belief, Stavola intentionally refused to reaffirm the JV Fees owed to Saloum at the March 28th HCWC board meeting to keep those obligations concealed from iAnthus.

63. Stavola made the 2019 representation to Saloum after already executing the iAnthus-MPX Transaction.

64. In 2019, iAnthus created a subsidiary management company named iAnthus Arizona LLC to oversee all management activities on behalf of iAnthus for HCWC. iAnthus Arizona allegedly received the management rights and beneficial control of HCWC from S8 Management—the same entity that Stavola previously represented to Saloum as being part of the larger "public company" that would honor the obligation to pay Saloum the JV Fees under the JV Agreement.

65. The JV Agreement further provides that "[t]his Agreement and the terms and provisions hereof shall inure to the benefit of and be binding upon the Parties and their respective permitted successors and assigns whenever the context so requires or permits."

66. Stavola has already attempted to assign the management rights and beneficial control of HCWC to various other entities, all while representing to Saloum that the JV Agreement was intact, and he would be paid the JV Fees owed to him.

67. Upon information and belief, Stavola induced a series of actions regarding the management rights to HCWC, including the iAnthus-MPX Transaction, with the intent to cover up Saloum's rights and interest in HCWC.

68. Saloum's JV Fees are not referenced in the iAnthus-MPX Transaction documents.

69. Upon information and belief, Stavola was aware that the iAnthus-MPX Transaction documents did not provide for HCWC's obligations under the JV Agreement or the JV Fees owed to Saloum, before, during, and after the iAnthus-MPX Transaction.

**The payments made to Saloum**

70. The JV Agreement provides for continued JV Fees to Saloum.

71. HCWC and iAnthus paid Saloum on July 26, 2019, $147,055.38 for the JV Fees for the year 2018.

72. HCWC and iAnthus paid Saloum on October 16, 2020, $251,578.00 for the

JV Fees for the year 2019.

73. HCWC and iAnthus paid Saloum on October 13, 2021, $427,851.00 for the JV Fees for the year 2020.

74. HCWC and iAnthus have not paid Saloum the JV Fees for the years of 2021 and 2022.

75. HCWC and iAnthus' refusal to continue paying the JV Fees is based on its position that it was unaware of Saloum's interest in HCWC prior to closing the iAnthus-MPX transaction.

76. Stavola intentionally papered over Saloum's contractual rights under the JV Agreement, including the JV Fees, when she entered into the iAnthus-MPX transaction, which resulted in Saloum's damages as described herein.

77. Saloum relied on Stavola's representations that his JV Fees were intact and that she or her company would honor the obligations in the JV Agreement. At the time of Stavola's representations, the HCWC dispensary was either in the process of being opened or had only just recently started operating, meaning Saloum was first owed JV Fees for 2018 and would not expect to be paid the 2018 JV Fees until sometime in 2019 after HCWC's taxes were completed.

78. As discussed above, HCWC paid the JV Fees owed to Saloum for the first three years under the JV Agreement. Thus, Saloum's claims were not ripe until HCWC refused to pay Saloum for the JV Fees owed for 2020. That confirmation did not happen until November 18, 2021, which is the date HCWC and iAnthus filed a lawsuit seeking declaratory relief that they had no obligations under the JV Agreement.

79. The dispute between Stavola and Saloum is now ripe for relief.

///

///

///

**<u>Count 1</u>**

**Tortious Interference with Contract and/or Business Expectancies by Stavola**

(Stavola tortiously interfered with Saloum's contractual rights by concealing Saloum's JV Fees' rights during the MPX and iAnthus-MPX Transaction leading to non-payment by iAnthus and HCWC.)

80. Saloum realleges and incorporates by reference the preceding paragraphs as though fully set forth herein.

81. Saloum had a valid contract and business expectancy for the JV Fees of 4% of the HCWC Dispensary's gross annual sales through the JV Agreement.

82. Stavola had direct knowledge of Saloum's valid business expectancy/contract as a signatory to the JV Agreement.

83. Upon information and belief, Stavola, who was aware of Saloum's rights, intentionally and wrongfully excluded Saloum's interest in HCWC in connection with the iAnthus-MPX Transaction. Stavola's conduct induced iAnthus and HCWC to stop payment of Saloum's JV Fees.

84. Upon information and belief, Stavola also intentionally excluded ECO from the iAnthus-MPX Transaction as another means of covering up Saloum's rights under the JV Agreement.

85. Upon information and belief, Stavola, as a lead negotiator and principal officer of MPX, was intimately involved in the negotiation and preparation of the transaction documents used for the iAnthus-MPX Transaction.

86. Upon information and belief, Stavola's tortious interference of Saloum's contractual rights included a wrongful failure to disclose Saloum's rights to his JV Fees in connection with the iAnthus-MPX Transaction.

87. Even after the iAnthus-MPX Transaction, Stavola's tortious interference did not end. Upon information and belief, Stavola led the March 2019 HCWC Board Member Meeting in which she actively concealed the 2018 Arbitration Award and Saloum's JV Fees.

88. Stavola's conduct tortiously interfered with Saloum's expectancy of his JV Fees.

89. Saloum reasonably relied upon Stavola's multiple representations regarding his JV Fees.

90. Saloum did not become aware of Stavola's tortious interference until iAnthus and HCWC's refusal to pay Saloum's JV Fees and highlighted their reason to not pay.

91. Saloum has suffered damages as a result of Stavola's conduct which led to the stoppage of payments to Saloum under the JV Agreement.

92. Saloum has been directly and proximately damaged by HCWC and Stavola's intentional interference and impairment of the contract and business expectancy.

93. Saloum has been damaged in an amount to be proven at trial but at a minimum, the 4% gross sales of HCWC for the years 2021, 2022, and all subsequent years during the pendency of this litigation.

94. Stavola's tortious interference became apparent to Saloum once iAnthus and HCWC failed to pay the JV Fees for the year 2021 and initiated a lawsuit against Saloum on November 18, 2021.

95. The acts of Stavola were malicious, fraudulent, oppressive, and intentional or consciously pursued by Stavola knowing that it created substantial risk of significant harm to Saloum, justifying the imposition of punitive damages. The amount of punitive damages should be appropriate to punish Defendant and to deter Defendant and others from engaging in similar conduct.

**<u>Count 2</u>**

**Fraud**

(Stavola fraudulently misrepresented to Saloum that his JV Fees were intact and HCWC would pay Saloum' JV Fees while actively operating to prevent that from happening in the future)

96. Saloum realleges and incorporates by reference the preceding paragraphs as

though fully set forth herein.

97. Fraud has nine elements: (1) a representation, (2) its falsity, (3) its materiality, (4) the speaker's knowledge of its falsity or ignorance of its truth, (5) the speaker's intent that it should be acted upon by the hearer and in the manner reasonably contemplated, (6) the hearer's ignorance of its falsity, (7) the hearer's reliance on its truth, (8) the hearer's right to rely thereon, and (9) the hearer's consequent and proximate injury. *Carrel v. Lux*, 101 Ariz. 430, 434, 420 P.2d 564, 568 (1966).

98. Stavola made multiple representations in 2018 and 2019, which confirmed and represented to Saloum that his JV Fees were intact and that she or her company would honor the obligations under the JV Agreement.

99. Upon information and belief, Stavola's representations were in connection with Stavola's ongoing or pending transaction involving HCWC's management rights and beneficial control.

100. Stavola's representations were false. HCWC and iAnthus failed to pay Saloum his JV Fees for the years 2021, 2022, and onwards.

101. Stavola's representations were material: she was a PO/BM of HCWC as well as the Chief Strategist Officer and Board Member of iAnthus. Stavola's representations were in direct connection to Saloum's contractual rights, as Stavola represented that Saloum's JV Fees are valid and enforceable. Without Stavola's representations, Saloum would have actively pursued and enforced his contractual rights under the JV Agreement.

102. Upon information and belief, Stavola knew the falsity of her representations. Stavola was involved on both sides of the transaction and was a signatory to the iAnthus-MPX Transaction.

103. Stavola represented to Saloum, through counsel, on January 30, 2019, that his JV Fees were intact. This was after the iAnthus-MPX Transaction arrangement agreement was executed in October 2018. As a result, Stavola knew of the falsity of her

representations or was ignorant to the truth by failing to actually review the iAnthus-MPX Transaction documents.

104. Upon information and belief, Stavola made these representations to Saloum, while at the same time concealing Saloum's right to his JV Fees both within the iAnthus-MPX Transaction documents and in-person at HCWC's board meetings.

105. Upon information and belief, Stavola intended for Saloum to act upon her representations: Stavola made representations that HCWC would honor his JV Fees under oath and separately in connection with requesting Saloum step down from HCWC's board of directors.

106. Upon information and belief, Stavola wanted to ensure that the iAnthus-MPX Transaction went according to her plan, so she made the representations described herein so as to prevent Saloum from raising any concern about his JV Fees.

107. Since Stavola's fraudulent acts initially occurred in the early stages of HCWC's operations, Saloum had no choice but to ignorantly believe and rely on Stavola and HCWC's false reassurances. There was no other history or operations of HCWC for Saloum to use as a basis. Saloum could not have demanded payment of his JV Fees at the time of the fraudulent representation because HCWC was barely operational, there was no full year sales for his JV Fees and taxes to be calculated from.

108. Additionally, Saloum relied upon Stavola's representations because HCWC and iAnthus initially paid the first three years of JV Fees owed under the JV Agreement.

109. Saloum rightfully relied upon the fraudulent representations in 2018 and 2019 considering the pending payment of Saloum's JV Fees.

110. Saloum in fact has been deprived of his 4% JV Fees rights as a result of Stavola's fraudulent misrepresentation and papering over of Saloum's contractual rights. iAnthus and HCWC last paid Saloum's annual JV Fee in October 2021 covering the 2020 calendar year of HCWC sales.

111. Saloum has been damaged in an amount to be proven at trial but at a minimum, the 4% gross sales of HCWC for the years 2021 and 2022.

112. The acts of Defendant were malicious, fraudulent, oppressive, and intentional or consciously pursued by Defendant knowing that it created substantial risk of significant harm to Saloum, justifying the imposition of punitive damages. The amount of punitive damages should be appropriate to punish Defendant and to deter Defendant and others from engaging in similar conduct.

## Count 3
## Constructive Fraud

(Stavola engaged in constructive fraud by breaching her equitable duty to Saloum by fraudulently mispresenting his JV Fees were intact while engaging in conduct to the contrary)

113. Saloum realleges and incorporates by reference the preceding paragraphs as though fully set forth herein.

114. Saloum alleges constructive fraud against Stavola in the alternative.

115. Upon information and belief, Stavola breached her equitable legal and fiduciary duty to Saloum and HCWC.

116. Upon information and belief, irrespective of the moral guilt or intent, Stavola's breach, and fraud deceived Saloum and HCWC and violated private confidences between the parties.

117. Stavola holds an equitable duty and fiduciary relationship to Saloum and HCWC through being a signatory to the JV Agreement, participation in the 2018 Arbitration Award, and involvement as a principal officer and board member of HCWC.

118. Saloum holds an interest in HCWC and Stavola made her fraudulent representations while a principal officer and board member of HCWC.

119. At relevant times, Stavola and Saloum were both board members of HCWC.

120. Stavola based upon her fiduciary responsibility, held a duty to make full and truthful disclosures of all material facts and is liable for misrepresentation and

concealment.

121. Fraud has nine elements: (1) a representation, (2) its falsity, (3) its materiality, (4) the speaker's knowledge of its falsity or ignorance of its truth, (5) the speaker's intent that it should be acted upon by the hearer and in the manner reasonably contemplated, (6) the hearer's ignorance of its falsity, (7) the hearer's reliance on its truth, (8) the hearer's right to rely thereon, and (9) the hearer's consequent and proximate injury. *Carrel v. Lux*, 101 Ariz. 430, 434, 420 P.2d 564, 568 (1966).

122. Stavola made multiple representations in 2018 and 2019, all confirming and representing to Saloum that his JV Fees were intact.

123. Upon information and belief, all of these representations were in connection with Stavola's ongoing or pending transaction involving HCWC's management rights and beneficial control.

124. Stavola's representations were false. HCWC and iAnthus failed to pay Saloum his JV Fees for the years 2021, 2022, and onwards.

125. Stavola's representations were material, she was a principal board officer and leading board member of HCWC as well as Chief Strategist Officer and Board Member of HCWC. Stavola's representations were in direct connection to Saloum's contractual rights, Stavola is representing Saloum's JV Fees are valid and enforceable. Without Stavola's representations, Saloum would have actively pursued and enforced his contractual rights.

126. Upon information and belief, Stavola knew the falsity of her representations. Stavola was involved on both sides of the transaction and was a signatory to the iAnthus-MPX Transaction.

127. Stavola represented to Saloum through counsel on January 30, 2019, that his JV Fees were intact. This is after the iAnthus-MPX Transaction arrangement agreement was executed in October 2018. As a result, Stavola knew of the falsity of her representations or was ignorant to the truth by failing to actually review the iAnthus-MPX

Transaction documents.

128. Upon information and belief, Stavola made these representations to Saloum, while at the same time concealing Saloum's right to his JV Fees both within the iAnthus-MPX Transaction documents and in-person at HCWC's Board meetings.

129. Upon information and belief, Stavola intended for Saloum to act upon her representations, Stavola made these representations that HCWC would honor his JV Fees under oath and separately in connection with requesting Saloum step down from HCWC's board of directors.

130. Upon information and belief, Stavola wanted to ensure her iAnthus-MPX Transaction went according to her plan and muted Saloum from continuing to raise his concerns of his JV Fees by her misrepresentations.

131. Since Stavola's fraudulent acts initially occurred in the early stages of HCWC's operations, Saloum had no choice but to ignorantly believe and rely upon Stavola and HCWC's false reassurances. There was no other history or operations of HCWC for Saloum to use as a basis. Saloum could not have demanded payment of his JV Fees at the time of the fraudulent representation because HCWC was barely operational, there was no full year sales for his JV Fees and taxes to be calculated from.

132. Additionally, Saloum relied upon Stavola's representations because HCWC and iAnthus initially paid the first few years of the JV Fees.

133. Saloum rightfully relied upon the fraudulent representations in 2018 and 2019 considering the pending payment of Saloum's JV Fees.

134. Saloum in fact has been deprived of his 4% JV Fee rights as a result of Stavola's fraudulent misrepresentation and papering over of Saloum's contractual rights. iAnthus and HCWC last paid Saloum's annual JV Fee in October 2021 covering the 2020 calendar year of HCWC sales.

135. Saloum has been damaged in an amount to be proven at trial but at a minimum, the 4% gross sales of HCWC for the years 2021, 2022, and all subsequent years during the pendency of this litigation.

136. The acts of Defendant were malicious, fraudulent, oppressive, and intentional or consciously pursued by Defendant knowing that it created substantial risk of significant harm to Saloum, justifying the imposition of punitive damages. The amount of punitive damages should be appropriate to punish Defendant and to deter Defendant and others from engaging in similar conduct.

**Count 4**

**Unjust Enrichment**

(Stavola has been unjustly enriched to the detriment of Saloum)

137. Saloum realleges and incorporates by reference the preceding paragraph as though fully set forth herein.

138. Saloum conferred the benefit of the management rights and beneficial control to Stavola through her entity ECO, in exchange for his JV Fees.

139. Stavola gained the management rights and beneficial control of HCWC to her benefit. Stavola was able to sell and transfer the rights/benefits conferred to her by Saloum to iAnthus in exchange for high monetary value.

140. Stavola understood the value of the transaction for the management rights and beneficial control of HCWC were agreed upon in the JV Agreement, more specifically the JV Fees.

141. Stavola's benefit is to Saloum's expense as upon information and belief, Stavola papered over the transaction to void Saloum of his JV Fees.

142. It would be unjust for Stavola to maintain the benefit while Saloum is deprived of his JV Fees.

143. Saloum has been improved by Stavola's conduct.

144. The unjust enrichment connection is Stavola was able to sell the rights given

to her by Saloum.

145. This claim is pled in the alternative.

146. To avoid this unjust enrichment by Stavola, Saloum is entitled to damages in the minimum amount of the 4% gross sales of HCWC for the years 2021 and 2022, and such other amounts to be proven at trial.

**Demand for Relief**

WHEREFORE, Plaintiff respectfully requests this Court grant judgment in his favor and against Defendant, as follows:

a. Judgment in Plaintiff's favor on all the above counts against Defendant;

b. Damages in an amount to be determined at trial;

c. Damages in the amount of unpaid fees owed to Plaintiff for all applicable years, including 2021 and 2022;

d. Punitive damages in an amount appropriate to punish Defendant and to deter Defendant and others from engaging in similar conduct;

e. For all costs and expenses incurred herein, including reasonable attorney's fees under A.R.S. §§ 12-341, 12-341.01, and all other applicable statutes;

f. Pre-and post-judgment interest at the legal rate of ten percent per annum; and

g. Such other and further relief as the Court may deem just and proper.

DATED this 17th day of November, 2023.

**BIANCHI & BRANDT**

By: *s/Justin M. Brandt*
Justin M. Brandt, Esq.
Allan Bach, Esq.
6730 N. Scottsdale Road, Suite 100
Scottsdale, Arizona 85253
*Attorneys For Plaintiff Arvin Saloum*

**CERTIFICATE OF SERVICE**

I hereby certify that on November 17, 2023, I electronically filed the foregoing with the Clerk of the U.S. District Court using the CM/ECF system which will send notification of such filing to the CM/ECF registrants, including:

Christopher L. Hering
Ivan Gonzalez
Gammage & Burnham, P.L.C.
40 North Central Avenue, 20th Floor
Phoenix, Arizona 85004
chering@gblaw.com
igonzalez@gblaw.com
docket@gblaw.com
*Attorneys for Defendant Elizabeth Stavola*

By: *s/Donovan Snipes*

**VERIFICATION**

I, Arvin Saloum, declare under penalty of perjury that I have read the foregoing Complaint, that I know the contents thereof, and that the same are true and correct to the best of my knowledge, information, and belief.

Executed this 17th day of November, 2023.

Arvin Saloum
Arvin Saloum